IN RE: K.M.F. and K.B.D., Minor Children.
No. COA08-519
Court of Appeals of North Carolina.
Filed October 7, 2008
This case not for publication
J. Gregory Matthews, for Yadkin County Department of Social Services, Petitioner.
Michael E. Casterline, for Respondent Father.
Carol Ann Bauer, for Respondent Mother.
Tracie M. Jordan, for Guardian Ad Litem.
ARROWOOD, Judge.
Respondent Mother M.S. (Mother) appeals from an order terminating her parental rights to the minor children, K.M.F. and K.B.D. Respondent Father T.F. (Father) appeals from the same order terminating his parental rights to the minor child, K.M.F. We affirm.
In late 2005, seven-year-old K.M.F. and her eleven-year-old half-sister K.B.D. lived with Mother and R.S. (Step-Father) in Yadkin County, North Carolina. K.M.F.'s Father resided in Mt. Airy and had been out of contact with K.M.F. for "a period [of] two years." On 20 December 2005, Yadkin County Department of Social Services (DSS) received a report of sexual abuse of K.M.F. and K.B.D., which stated that the children were "forced to perform oral sex on [Step-Father, and] . . . forced [to have] vaginal sex [with] him[.]" The report also stated that Step-Father "kiss[ed] their breast area and [bit] the area[.]" The children said that "[M]other was present at times when the abuse occurred[.]" The report explained that "[t]hese children were [previously] in foster care in Surry County due to domestic violence between their mother and [T.F.] (Father) . . . [and] Surry County substantiated sex abuse on [K.M.F.] and [K.B.D.] with [Father] being the perpetrator." As a result of these allegations, DSS obtained nonsecure custody of the children.
On 21 December 2005, DSS filed juvenile petitions alleging that the minor children were abused due to the "commission of a sex or pornography offense with or upon the juvenile in violation of the criminal law[,]" and neglected because the children live "in an environment injurious to [their] welfare."
On 17 February 2006, the court entered an order adjudicating K.M.F. and K.B.D. abused and neglected children pursuant to N.C. Gen. Stat. § 7B-101. The court revised the order on 7 March 2006, finding that Mother "admitted to the Social Worker that her husband, [R.S.], and she participated in sexual activities with both children, including oral sex, sexual fondling and viewing pornographic sites on a computer." Mother and [R.S.] (Step-Father) "are facing criminal charges arising out of these circumstances."
On 23 February 2006, Father, who had been absent from K.M.F.'s life for two years, enrolled in an Out of Home Family Services Agreement Plan with DSS, which requested that Father: (1) complete a psychological evaluation; (2) complete a sex offender evaluation; and (3) complete parenting classes. Father failed to complete parenting classes and refused to take a polygraph exam, which was a critical step in the sex offender evaluation. Father underwent a psychological evaluation with Dr. Phillip Batten on 20 April 2006 and 15 May 2006. Dr. Batten stated that "[Father] reads on about a third grade level, and that both socially and intellectually his world is `limited.'" Father has an IQ of 72.
On 4 December 2006, the trial court relieved DSS of reunification efforts with Father due to "[Father's] refusal to complete the requirements of [the service agreement] and his psychological inability to function as a single parent without some support from friends, family and professionals." The court relieved DSS of reunification efforts with Mother due to her incarceration on two counts of felony child abuse and two counts of felony aiding and abetting felony child abuse arising from the sexual acts against the minor children, K.M.F. and K.D.B.
On 31 January 2007, petitioner filed a motion in the cause to terminate parental rights, alleging that grounds existed to terminate Father's parental rights pursuant to N.C. Gen. Stat. §§ 7B-1111(a)(1), 7B-1111(a)(2), 7B-1111(a)(3) and 7B-1111(a)(6), and Mother's parental rights pursuant to N.C. Gen. Stat. §§ 7B-1111(a)(1), 7B-1111(a)(2), 7B-1111(a)(3), 7B-1111(a)(6), 7B-1111(a)(7), and 7B-1111(a)(8). On 20 December 2007, the trial court entered an order terminating the parental rights of Mother and Father, concluding that the following grounds for termination existed with regard to Father: N.C. Gen. Stat. §§ 7B-1111(a)(1), 7B-1111(a)(2) and 7B-1111(a)(6). The court concluded that the following grounds for termination existed with regard to Mother: N.C. Gen. Stat. §§ 7B-1111(a)(1), 7B-1111(a)(2), 7B-1111(a)(6), 7B-1111(a)(7) and 7B-1111(a)(8). From this order, Mother and Father appeal.

Termination of Parental Rights
"`A termination of parental rights proceeding is a two-stage process.'" In re T.D.P., 164 N.C. App. 287, 288, 595 S.E.2d 735, 736 (2004) (quoting In re Howell, 161 N.C. App. 650, 656, 589 S.E.2d 157, 160 (2003)). "At the adjudication stage, the petitioner must show by `clear, cogent and convincing evidence' the existence of one or more of the statutory grounds for termination of parental rights set fourth in section 7B-1111." In re Yocum, 158 N.C. App. 198, 203, 580 S.E.2d 399, 403 (2003). "If the trial court determines that any one of the grounds for termination listed in § 7B-1111 exists, the trial court may then terminate parental rights consistent with the best interests of the child." In re T.D.P., 164 N.C. App. at 288, 595 S.E.2d at 736. The trial court may terminate parental rights on the basis of several grounds, but "[a] finding of any one of the . . . separately enumerated grounds is sufficient to support a termination." In re Pierce, 67 N.C. App. 257, 261, 312 S.E.2d 900, 903 (1984). On appeal, the standard of review from a trial court's decision to terminate parental rights is whether "the court's findings of fact are based upon clear, cogent and convincing evidence and the findings support the conclusions of law." In re Allred, 122 N.C. App. 561, 565, 471 S.E.2d 84, 86 (1996).
Mother first argues that the trial court erred in terminating her parental rights without considering whether placement with a relative, specifically the children's Grandmother and Aunt, was possible. Because we find that the trial court did, in fact, consider familial placement, this argument is without merit.
N.C. Gen. Stat § 7B-907(b)(2) (2007) requires that the trial court consider "whether legal guardianship or custody with a relative or some other suitable person should be established, and if so, the rights and responsibilities which should remain with the parents."
Mother specifically argues that "[b]y terminating [Mother's] parental rights, the trial court . . . cut[s] the children's ties to their blood relatives[,]" which was not in the best interest of the children. Mother contends that because "[Grandmother] and [Aunt] had been `in contact' with [Mother's attorney] . . . [and] had `a desire to keep a relationship with the children[,]'" the trial court "should have explored [the option of placement with Grandmother or Aunt] before destroying all of the children's family ties." We find this argument unconvincing because the trial court did, in fact, consider placement with the minor children's relatives.
On 14 December 2006, the trial court entered a permanency planning review order, from which Mother did not appeal, stating the following:
The Court has considered placement of the minor children with a relative who is willing and able to provide proper care and supervision in a "safe home," having given the possibility of placement with a relative priority. However, The Court finds that the best interest of the minor children would be served by continuing their custody with the Yadkin County Department of Social Services for placement at their discretion. . . . Even after giving placement with a relative priority, it is in the best interest of these children to continue their custody with the Yadkin County Department of Social Services with placement at the discretion of the Yadkin County Department of Social Services and at this time no relative or others should be given guardianship or custody of these children.
The trial court also found that "[t]hese children have been severely sexually abused. Because of this abuse, any person who is the caretaker for these children will need to be extremely knowledgeable in the care and treatment of sexually abused children."
At the termination hearing, Wheeler provided further evidence regarding the consideration of placement with Mother's relatives. Wheeler stated that she had spoken to Mother's sister, who expressed no desire "for the children to be with her or [Grandmother]." We conclude the trial court considered and made written findings regarding N.C. Gen. Stat. § 7B-907(b)(2) in its permanency planning order. Because we find that alternative familial placement was considered by the trial court, Mother's assignment of error fails.
In Mother's next argument, she contends the trial court erred in concluding that it is in the best interest of the minor children K.M.F. and K.B.D. that Mother's parental rights be terminated. We disagree.
"[W]e reemphasized the fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody . . . that the best interest of the child is the polar star." In re Montgomery, 311 N.C. 101, 109, 316 S.E.2d 246, 251 (1984). "The welfare or best interest of the child is always to be treated as the paramount consideration to which even parental love must yield." Wilson v. Wilson, 269 N.C. 676, 678, 153 S.E.2d 349, 351 (1967). If one or more of the specific grounds for termination listed in N.C. Gen. Stat. § 7B-1111 are shown in the adjudication phase of the termination proceedings, then the court moves to the disposition stage to determine whether it is in the best interests of the child to terminate the parental rights. In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000). Upon finding grounds for termination, the trial court is not required to terminate parental rights, but is merely given discretion to do so. Montgomery, 311 N.C. at 109, 316 S.E.2d at 251. On appeal, we review to determine whether the court's findings of fact regarding its best interest determination are based upon clear, cogent and convincing evidence and whether the findings support the conclusions of law. Huff, 140 N.C. App. at 291, 536 S.E.2d at 840.
In the instant case, Mother does not argue that the findings of fact supporting the grounds for termination of her parental rights pursuant to N.C. Gen. Stat. § 7B-1111 were not supported by clear, cogent and convincing evidence. Rather, Mother contends that despite the existence of grounds for termination, it was not in the best interest of the minor children to terminate her parental rights. We disagree. Here, the trial court provided sixty-seven detailed findings of fact regarding the abuse and neglect of the minor children. The trial court properly considered the plenary evidence of abuse and neglect by Mother, and with regard to her abuse of the minor children, made the following findings:
14. . . . K.M.F. [and] K.B.D. told the social worker that [R.S.] had "licked her between her legs and licked her boobies" and that [R.S.] had "put his dick in her puy[.]" K.B.D. further reported to social worker that this has happened about twenty times. Subject minor child K.M.F. was more open with social worker and reported that [R.S.] had both vaginal and anal sex with said K.M.F. in the presence of the Respondent Mother. Said K.M.F. also reported that the Respondent Mother and [R.S.] made her watch movies of adults having sex with animals. Furthermore, K.B.D. made statements that the Respondent Father [T.F.] had sexually abused K.M.F.
15. A physical exam at said Wake Forest Baptist Medical Center revealed a notch in K.B.D.'s hymen which appeared to be a sign of sexual abuse.
. . . .
19. K.M.F. has post traumatic stress disorder, reactive detachment disorder and trust issues. . . . K.M.F. bangs her head against the wall, openly masturbates, spoke with her foster mother about engaging in sex acts with her, attempted to engage other adults to have sex with her, attempted to allure other children to have sex with her, and she spoke openly about sexual acts committed upon her by Respondent Mother and [R.S.]. Also, K.M.F. made a sex toy that she put in her vaginal and anal area to stimulate herself. . . .
20. Clinical social worker Dana Horne was qualified as an expert in the area of treating children with trauma. Said Dana Horne opined and the Court finds as fact that K.B.D. has been sexually abused for many years of her early life. . . . Said Dana Horne reported and the Court finds as fact that the sexual abuse suffered by K.B.D. is severe and chronic. K.B.D. reported to Dana Horne that the Respondent Father [T.F.] engaged with oral, vaginal, and anal sex with her, but she would not give graphic details of any encounters. [K.B.D.] did demonstrate with a gingerbread drawing what Respondent [T.F.] did to her. K.B.D. also reported that the Respondent Mother was involved with sexual acts with her and "mother made me do things." K.B.D. has requested sex with many various people and thinks that it is normal for adults to have sex with children. K.B.D. has described having anal sex with Respondent [T.F.] and others.
. . . .
25. The Respondent Mother . . . entered [a] plea of guilty to two counts of felony child abuse and two counts of aid/abet indecent liberties. Said Respondent Mother . . . is serving a sentence in the North Carolina Department of Corrections from sixty four months to ninety six months.
. . . .
27. Both of the subject minor children almost immediately upon placement with [P.H.] asked said [P.H.] to have sex with them.
28. At the time of this placement, [K.B.D.] was more withdrawn and shy than [K.M.F.] [K.B.D.] would whisper in [K.M.F.'s] ear and ask to have sex with [P.H.]. Over a period of time, [K.B.D.] began speaking in one word sentences. During this time frame, K.B.D. would wake up screaming and shaking with nightmares and she was afraid to leave the house.
. . . .
34. In an interview with the Surry County Sheriff's department, K.B.D. apologized for the things she had done with Respondent Father [T.F.], Respondent Mother [M.S.] and [R.S.]
. . . .
38. Cynthia Stewart of Wake Forest University Baptist Medical Center was qualified as an expert in the field of child sexual abuse, and the Court finds that K.B.D. told said Ms. Stewart that K.B.D. had been sexually abused by Respondent Mother and [R.S.], that Respondent Mother was in jail for "messing with her bottom" and that Respondent Mother and [R.S.] told her not to tell anyone or they would get in trouble. Said K.B.D. also told Ms. Stewart that K.M.F.'s dad (Respondent Father [T.F.]) did the same thing.
. . . .
41. The Respondent Mother and Respondent Father [T.F.] stipulated to neglect in March, 1999 in a Surry County case.
. . . .
43. Subject minor child K.M.F. has attempted suicide on at least two occasions and was subsequently placed in a psychiatric unit at Moses Cone Hospital in Greensboro.
. . . .
45. Respondent Mother signed a [sic] out of home family services agreement, but has completed nothing in said agreement. Respondent Mother has been in either jail or Department of Corrections since December, 2005.
The trial court further found that "K.B.D. is doing well in her current placement with therapeutic foster mother [P.H.] and that her grades are reasonably good[.]" The trial court said, "K.M.F. is currently placed in a in-patient therapeutic treatment home and that she is doing fairly well with her grades." Considering the quality of the relationships in K.M.F. and K.B.D.'s current placements, the trial court concluded that "it is in the best interest of K.M.F. and K.B.D. that the parental rights of [Mother] . . . be terminated[.]"
We have reviewed the record and conclude that there is clear, cogent and convincing evidence to support the trial court's findings of fact, and further conclude that there was ample evidence from which the trial court could determine that it was in the best interest of the children that Mother's parental rights be terminated. This assignment of error is overruled.

Stenography
In Mother's final argument, she contends that the termination order should be remanded for compliance with N.C. Gen. Stat. § 7A-198, because the court conducted an unrecorded "issues conference" in chambers.
N.C. Gen. Stat. § 7B-1109(a) (2007) requires that the reporting of an adjudicatory hearing on termination "shall be asprovided by G.S. 7A-198 for reporting civil trials." N.C. Gen. Stat. § 7A-198(a) (2007) requires that "[c]ourt-reporting personnel shall be utilized, if available, for the reporting of civil trials in the district court. If court reporters are not available in any county, electronic or other mechanical devices shall be provided by the Administrative Office of the Courts upon request of the chief district judge."
This Court has held, "it is not necessarily reversible error for the hearing or trial to go unrecorded." Holterman v. Holterman, 127 N.C. App. 109, 112, 488 S.E.2d 265, 267 (1997) (citing McAlister v. McAlister, 14 N.C. App. 159, 187 S.E.2d 449 (1972); In re Nolen, 117 N.C. App. 693, 696, 453 S.E.2d 220, 222 (1995)). The moving party must show that failure to record the judicial proceedings prejudiced him in some way. McAlister, 14 N.C. App. 159, 187 S.E.2d 449. In the instant case, Mother argues that the following unrecorded exchange in chambers violated N.C. Gen. Stat. § 7A-198(a):
Before we proceed to hear any further motion _ or hear any motions or evidence in this case, there's a necessity that we need to have an issues conference prior to any further motions, so at this time, I think we can get everybody in chambers. If we can do so, I'd like to go ahead and conduct the issues conference.
The trial judge then conducted the unrecorded conference, after which he reconvened court, stating:
All right. Ladies and gentlemen, we have now had an opportunity to have an issues conference involving this matter. The motion of the cause to terminate parental rights was filed January 31, 2007, in our issuesconference, but I'll just go through them respondent by respondent. . . . With regard to the respondent, [Mother], I believe she determined a issue's conference on allegation  and, issue of abuse, the parents, alleged  the parent has abused and neglected the child within the meaning [of] N.C. Gen. Stat. § 7B-101, that there's an allegation the issue that the parent has willfully left the child in foster care, a placement outside of the home for more than twelve months . . . the issue of dependency, as well as the issue of abandonment[.] . . . [There is the additional issue] that [Mother] committed a felony assault against the juveniles[.]
The transcript shows that the court asked the attorneys four times whether "[there were] [a]ny other issues related to the respondent[s]." The trial court also specifically asked, "[a]re there any  any other matters involving the issues conference that  any of the attorneys [would] like to put on the record?" The transcript reveals that the trial court restated for the record the issues discussed in unrecorded conference. Mother added nothing to the trial court's statements regarding the conference, and Mother made no objection to the fact that the conference was unrecorded.
We believe In re Nolen, 117 N.C. App. 693, 453 S.E.2d 220 (1995), is binding precedent here. In the opinion, In re Nolen, the testimony of two children, ages five and seven, was not recorded because the children were unwilling to take the witness stand.
The judge . . . allowed the children to testify in chambers with all counsel present. The proceedings in chambers were not recorded. After the children testified, recording of the hearing resumed. At the request of respondent, the court summarized for the record the children's testimony.In re Nolen, 117 N.C. App. at 696, 453 S.E.2d at 220. The respondent in Nolen argued that "because the children's testimony was not recorded, respondent must receive a new hearing." This Court held, however, that "showing a violation of section 7A-198 is not enough; respondent must also show that the error was prejudicial." Id. at 696, 453 S.E.2d at 222 (citing Miller v. Miller, 92 N.C. App. 351, 354, 374 S.E.2d 467, 469 (1988)).
On appeal, Mother makes no attempt to show prejudice derived from the court's failure to record the conference, but simply states that the conference "was not recorded" and "the trial court did not comply with the mandates of N.C. Gen. Stat. §§ 7B-1109 and 7A-198." Therefore, Mother argues "this matter should be remanded." This Court has clearly held that "showing a violation of section 7A-198 is not enough; respondent must also show that the error was prejudicial." In re Nolen, 117 N.C. App. at 696, 453 S.E.2d at 222. Mother failed to show prejudice here. This assignment of error is overruled.
In Father's argument on appeal, he contends that the trial court erred by concluding that grounds existed to terminate his parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(2). We disagree.
N.C. Gen. Stat. § 7B-1111(a)(2) (2007) provides for termination of parental rights if "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 [twelve] months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." In considering the ground for termination under N.C. Gen. Stat. § 7B-1111(a)(2) (2007), the trial court must go through a two-part analysis and determine: (1) "that a child has been willfully left by the parent in foster care or placement outside the home for over twelve months"; and (2) "as of the time of the hearing, . . . that the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child." In re O.C. & O.B., 171 N.C. App. 457, 464-65, 615 S.E.2d 391, 396 (2005). Willfulness under this section means something less than willful abandonment and does not require a finding of fault by the parent. In re Oghenekevebe, 123 N.C. App. 434, 439, 473 S.E.2d 393, 398 (1996). "A finding of willfulness is not precluded even if respondent has made some efforts to regain custody of the children." In re Shepard, 162 N.C. App. 215, 224, 591 S.E.2d 1, 7-8 (2004).
In the instant case, the trial court made the following pertinent findings of fact to support its conclusion that grounds existed to terminate Father's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(2):
16. The subject minor children were taken into non-secure custody on December 20, 2005[.] . . .
. . . .
35. Subject minor child K.B.D. indicated in the Fall of 2006 to [P.H.] (foster mother) that Respondent Father [T.F.] had tried to "put his penis inside of K.M.F." . . .
. . . .
42. Since December 20, 2005, none of the . . . Respondents have had any visitation with the two subject minor children.
. . . .
52. The Respondent Father [T.F.] entered into an out of home family services plan agreement with the Petitioner on or about February 23, 2006. Out of home family services [plan] included the following: have a psychological evaluation, have a sex offender evaluation and complete parenting classes. However he has failed to complete the same in that he did not complete parenting classes and he refused to take a polygraph exam that was a critical step in the sex offender evaluation. Dorothy Walker testified that Respondent . . . would not have been able to take and complete the parenting classes or other treatment through her office without having taken a polygraph exam or otherwise completing a sex offender evaluation. However, Social Worker Wheeler testified that the Petitioner did not stop said Respondent . . . from taking and completing the parenting classes and in any event Respondent . . . did not complete any parenting classes.
53. Said Respondent . . . had a psychological evaluation with Dr. Phillip Batten on April 20, 2006 and May 15, 2006. . . . Dr. Batten testified that . . . in his expert opinion . . . Respondent . . . could [not] function as a parent to K.M.F. without always having significant help and that it would take years, and not months, for him to function as a parent in any meaningful role.
54. . . . Dorothy Walker [who qualified as an expert in sexual abuse treatment] scheduled a polygraph exam for Respondent . . ., which said Walker testified was a normal tool in evaluating and treating potential sex offenders. Respondent . . . did not show up for the polygraph exam and when Dorothy Walker reached him, he said that he had to work, although it has been reported that he is on disability. Furthermore, Respondent . . . said that he did "not really want to take[the] test." Respondent . . . never asked to reschedule the polygraph exam and accordingly no plan for treatment was ascertained due to his failure to take the polygraph exam.
. . . .
57. In October, 2006, Respondent . . . and his father met with social workers for the Petitioner, and said Respondent . . . refused to comply with recommendation of the Petitioner has previously mentioned.
The record on appeal provides clear, cogent and convincing evidence to support the foregoing findings. Specifically, Karen Wheeler, a social worker for DSS, testified that DSS met with Father on two occasions, the first in October 2006 at a permanency planning hearing. At the October 2006 meeting, Father and [C.F.] (Grandfather) were present. Grandfather asked "if the girls were naming names and he said that `we are happy that [Father] is not in jail.'" During the meeting, DSS and Father also discussed what Father must do to complete his service agreement, beginning with the polygraph examination. Father flatly refused to take the polygraph test, stating: "I tell you to your face, I'm not doing that." As a result, Father was unable to complete the sex offender evaluation, which was a crucial component of his case plan with DSS.
Wheeler also provided the following testimony regarding Father's failure to make reasonable progress:
Q: Did [T.F.] complete his Family Services Agreement?
A: He did not.
Q: Okay. Has he had any visitation with [K.M.F.].
A: He has not.
. . . .
Q: Has the Department received any contact _ any letters from [T.F.] addressed to the children or anything like that?
A: Not to my knowledge.
Father specifically argues that his low I.Q. and inability to understand the requirements of the service agreement negate any showing of willfulness. We find this argument unpersuasive. In the opinion, In re K.S., 183 N.C. App. 315, 327, 646 S.E.2d 541, 548 (2007), this Court held that "the trial court is not required to alter its decision as to whether a parent is capable of providing proper care for a child based upon the parent's IQ." Id. This Court explained:
North Carolina General Statutes, section 7B-1111(a)(6) expressly allows for the termination of parental rights in situations where a parent lacks adequate cognitive functioning. See N.C. Gen. Stat. § 7B-1111(a)(6) [2007] (providing that parental rights may be terminated if "the parent is incapable of providing for the proper care and supervision of the juvenile" and "[i]ncapability under this subdivision may be the result of . . . mental retardation, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile."). In sum, respondent cannot use her purported IQ of 76 as a shield against the trial court's finding that she failed to exercise common sense.
Id. at 327-28, 646 S.E.2d at 548. Similarly, here, Father cannot use his low IQ as a shield against the trial court's finding of willfulness: Father's refusal to take a polygraph, failure to complete parenting classes; failure to visit, or send letters are sufficient to show willfulness. We conclude that clear, cogent and convincing evidence to support the trial court's determination that grounds existed to terminate Father's parental rights based on willfully leaving K.M.F. in foster care for more than twelve months without showing to the satisfaction of the court that reasonable progress under the circumstances had been made. N.C. Gen. Stat. § 7B-1111(a)(2). This assignment of error is overruled. Because "[a] finding of any one of the . . . separately enumerated grounds is sufficient to support a termination[,]" In re Pierce, 67 N.C. App. 257, 261, 312 S.E.2d 900, 903 (1984), we need not address Father's remaining assignments of error.
We conclude that the trial court's findings of fact regarding grounds to terminate the parental rights of Mother and Father were supported by clear, cogent and convincing evidence, and the findings, in turn, supported the trial court's conclusions of law. We further conclude that Mother was not prejudiced by the trial court's failure to record the "issues conference." We affirm the order of the trial court.
Affirmed.
Judges BRYANT and JACKSON concur.
Report per Rule 30(e).